ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY

*v.* WOODRUFF·

Opinion delivered January 18, 1909.

1. CARRIERS—RIGHT TO EJECT INSANE PASSENGER.—Where a passenger, un-attended, becomes insane upon a train, the railway company is author-ized to remove him therefrom if the comfort and safety of other passengers require it; but this right of exclusion should not be exer-cised inhumanely and without due care and provision for the safety and welfare of the ejected passenger. (Page 15.)

2. INSTRUCTIONS—BURDEN OF PROOF.—An instruction to the effect that the plaintiff should make out his case by a preponderance or a material part of the evidence was erroneous, since a material part of the evi-dence might or might not be a preponderance thereof. (Page 16.)

3. SAME—WHEN HARMLESS.—Where the uncontradicted evidence estab-lished defendant's negligence in a personal injury suit, an error in instructing as to the burden of proof was not prejudicial. (Page 16.)

4. CARRIERS—DUTY TO INSANE PASSENGER.—Where an insane passenger was ejected from a train, and left in charge of the defendant's night operator, who neglected to take care of her until the sheriff came and looked after her wants, it was not error to refuse to charge that defendant was not liable for anything that occurred after the sheriff got to her. (Page 17.)

5. TRIAL—ARGUMENT.—Where plaintiff, an insane passenger, was ejected from a train at night and left for some hours without attention, from which she suffered physical injuries and discomfort, it was not error to permit her counsel to argue that defendant could have arranged for a physician for plaintiff and provided a cot for her. (Page 18.)

6. DAMAGES—EXCESSIVENESS.—Where plaintiff asked for compensatory damages merely, and the proof showed that she had bruises on her body, from which she was confined to her bed for a couple of days, but no permanent injury was shown, a judgment for $1,000 is excessive and will be reversed unless plaintiff will remit $900. (Page 18.)

Appeal from Clark Circuit Court; *Frederick D. Fulkerson,* Judge on Exchange of Circuits; affirmed on remittitur.

STATEMENT BY THE COURT.

Appellee sued appellant, alleging that she was a passenger on appellant's road from Memphis, Tennessee, to Cleburne, Texas; that while *en route* appellee became temporarily insane and was unable to care for and protect herself; that appellant, in wanton disregard of appellee's rights as a passenger, did un-

lawfully, wrongfully and with force and violence, against appellee's protests, eject her from its train at Arkadelphia, about the hour of midnight, when it was dark, and did then and there, to the great wrong, injury and damage to appellee, leave her wholly among strangers, without making any proper provision for her protection, comfort, and personal safety; that appellant's employees knew at the time that appellee was ill and in a helpless condition. The complaint further alleged as follows: "That, being left at said station in such condition, plaintiff remained there until a late hour in the afternoon of next day, during all of which time she continued to be ill and temporarily insane, without mental capacity to care or provide for herself; that while she remained at said station she wandered about the premises and grounds, and for want of capacity to take care of herself she several times stumbled and fell upon piles of freight or other obstacles in her course, which caused her to suffer wounds and bruises to her person, and from the effects of which said wounds and bruises plaintiff suffered much physical pain and for a long time thereafter; that as a result from such wrongful expulsion plaintiff was wrongfully detained on her journey for the space of twelve hours or more among entire strangers and without a comfortable place to lodge or rest, and suffered great mental pain and anguish." Prayed judgment for $7,000 compensatory damages, and $1,000 punitive damages.

The answer specifically denied all the material allegations of the complaint.

Appellee, a lady sixty-seven years of age, was a passenger on appellant's train from Memphis, Tennessee, to Cleburne, Texas. She was sane when she took passage at Memphis, but, after leaving Little Rock, she became temporarily insane. Her conduct became more and more annoying to the other passengers. The conductor and others on the train endeavored to quiet and restrain her, but finally her speech and manner became so obscene, violent and obnoxious to the other passengers that the conductor at Malvern sent a message to the trainmaster asking what he should do. The trainmaster answered: "If passenger referred to is annoying passengers and can not be controlled, return her transportation and put her off at Arkadelphia, advising."

At Arkadelphia they put her off. She refused to get off, and two or three of the trainmen took her up by the arms and forced her off. They lifted her off and carried her into the station, using no more force than was necessary. She was put in the waiting room for the whites. It was a new depot, and a nice waiting room provided with seats for passengers, but none on which they could recline. It was about eleven o'clock at night. Those who put her off saw no other employee there except the night operator, and they turned her over to him and told him to take care of her; but he says, when she came that night, he asked her if there was anything he could do for her. "She cursed him and told him to get out, and he went *out the office window then.*"

Another witness says, after she was carried into the station, he "saw the night operator at the window, asked where he was going, and he said "he was leaving;" didn't see any one left there with her.

The sheriff of the county testified in part as follows:

"Two drummers came to my house after the train went south that night, and told me that an old woman was put off the train by force, that she was raving, and would probably wander out and be drowned in the rice pond near by; that she was in a condition to do so unless somebody looked after her. I told them it was not my special duty, but for humanity's sake I would do so. I went down there, found her standing across the window sill with one leg out; * * * half a dozen boys standing on the outside talking back and forth with her. * * * She was abusing them, and I made them go away. There was no one else there but the night operator, who was looking through the window, until the night watchman came down a while. * * * She said she was awful tired, and I went back to the house and got some blankets and a pillow, carried them down and made her a bed of them on the floor, and she laid down, but after three-fourths of an hour she got up and said she was too tired to lie down. * * * She was insane. * * * Next morning told Clark (the agent) he would have to make some arrangement for her, and he asked me what she was doing there. * * * There was no one at the station when he got there that night

except the operator, and he was on the outside. There are about four thousand inhabitants in Arkadelphia. * * * Said he stayed with the woman all night. There was no seat in the station upon which the woman could recline. The only furniture in the waiting room was seats and a stove. * * * The operator was sometimes in his room and sometimes out. I had some talk with the operator in charge of the depot, and he said he was glad I came to take charge of the woman, that "she could take charge of the whole damned thing, so far as he was concerned.' "

Another witness testified that he was at the depot early next morning when the sheriff was giving her breakfast, and was with the appellee an hour or more after he left, that she kept wandering around through the baggage room and one place and then another. Witness helped her up four times when she fell. After this witness left, the city marshal took charge of her. He detailed her conduct after he took her in charge, showing that she was insane. He and a gentleman whom he asked to assist him kept her till the train came. They took her into the baggage room to restrain her. She tried to get away, and would bite and scratch. When the passenger train came, going to Texas, they lifted her upon the train, put her in charge of the trainmen, who promised to look after her. She arrived at Cleburne, Texas, where her son lived. She was brought to her son's place of business by a friend of his. Her mental condition was still abnormal. She had an abrasion on her wrist, and complained of bruises on her body. Complained of her back, hips and arm. She suffered that way for a couple of weeks after she got to his home, and was confined to her bed a couple of days.

Appellant excepted to various rulings of the court in giving and refusing requests for instructions. It will be unnecessary to set all these out, but such as we desire to comment on specifically will be stated in the opinion.

Appellee's counsel, in his closing argument, used this language. "They could have arranged for a physician for plaintiff. * * * They could have provided a cot for plaintiff to have rested or lain upon." To this appellant objected, and excepted to the ruling of the court.

From a verdict and judgment for $1000 this appeal has been duly prosecuted.

*T. M. Mehaffy* and *E. B. Kinsworthy,* for appellant.

1. Appellant not only had the right, but it was its duty, to eject appellee from its train if she became insane, and, as set out in the seventh and tenth instructions given at appellant's request, it was not liable for any injury except such as she may have received after being left at Arkadelphia. 54 Fed. 122. The court's first instruction was in conflict with these instructions, and was erroneous in allowing the jury to award damages for injuries, if any, received on the train. Moreover, it is not the case that whenever the danger increases the care should increase, unless the appellant knew, or should have known, of the increased danger. 59 Ark. 180.

2. If the second instruction was intended to cover the time appellee was in the depot at Arkadelphia, it was erroneous in requiring the exercise by appellant of the highest degree of care. It is conceded that appellant's duty did not end with the removal of appellee from the train, but after her removal it was only under the duty to exercise reasonable and ordinary care to provide temporarily for her protection and comfort. 33 Kan. 543; 54 Fed. 122; Hutchinson on Car., 1119, 1143; 67 Kan. 515.

3. Appellant had the right to turn the appellee over to State authorities, and the jury should have been instructed that appellant was not liable for any injury received by her after the sheriff took charge of her. 54 Fed. 122; Kirby's Digest, § § 7754, 4049.

4. Where undisputed facts develop in case which should prevent the plaintiff from recovering, the court should give a peremptory instruction for the defendant. 84 Ark. 57; 82 Ark. 86. Here it is not disputed that no more force was used to eject appellee from the train than was reasonably necessary; that the train reached Arkadelphia between eleven and twelve o'clock at night, and that before twelve o'clock the sheriff had charge of her, appellee in the meantime remaining in the waiting room. The only evidence of any injury places the time of its occurrence as early in the morning, while she was in charge of the sheriff.

5. The second instruction requested by appellant should

have been given as asked; as amended by the court by inserting the work "or a material part," it was rendered erroneous. 37 Ark. 589.

6. The verdict was excessive. Under instructions given the verdict could properly be predicated on actual injury to compensate appellee for physical pain she may have suffered after she was left at the depot. No question of punitive damages was submitted to the jury, there being no evidence to justify it.

7. Appellee's attorney's argument was improper and prejudicial.

*John E. Bradley,* for appellee.

1. Appellant's liability turns on the question whether it observed its legal duty to appellee after she was ejected. Its duty did not cease with her removal from the train, but it was under the further duty to exercise reasonable care and diligence to make temporary provision for her protection and comfort—the reasonable and necessary offices of humanity towards her until some suitable provision could be made. 21 Am. & Eng. R. Cas. 418; 42 L. R. A. 664; 3 L. R. A. 133; 31 L. R. A. 372; 16 L. R. A. 674; 6 L. R. A. 241; 39 Fed. 174; 36 N. Y. 39; Thompson on Carriers, 270, § 5; 56 Pa. St. 294; 37 Fed. 841; 5 Am. Neg. Rep. 467, and notes.

2. Appellee based her right of recovery upon appellant's negligence after she was ejected from the train, her proof was directed to that end, and the court specifically charged in the seventh and tenth instructions, given at appellant's request, that she could only recover for injuries received after she was left at Arkadelphia. It will not be presumed that the jury disregarded those instructions and based their verdict on the first instruction alone, to which appellant objects. The instruction was correct. 52 Ark. 517; 55 Ark. 248; 59 Ark. 180.

3. The second instruction is correct. It does not require the "highest degree of care," but "such high degree of care for her safety and comfort as a reasonably prudent man would have done under similar circumstances."

4. Cases cited by appellant in support of its contention that it was not liable for any injury received after appellee was taken into custody of the sheriff, have no application to the facts in this

case.  Neither do the sections of Kirby's Digest relied on apply. The sheriff was not acting in an official capacity in what he did, but simply from motives of charity and ordinary humanity.

5.  Appellant's requested second instruction was properly refused in the form asked, and the amendment by incorporating the words "or a material part" was a harmless modification.

6.  Under the circumstances of this case, the injuries and inconveniences to which appellee was subjected by reason of appellant's gross neglect, the verdict is not excessive.  3 L. R. A. 133; 27 Am. & Eng. R. Cas. 148.

WOOD, J., (after stating the facts.)   1.  Appellee based her cause of action at the trial upon the alleged negligence of appellant, after appellee's ejection from the train, "in leaving her wholly among strangers, without making any proper provision for her protection, comfort and personal safety."   The court told the jury that "the only element of damage or injury the jury are authorized to consider is actual personal physical injury received by plaintiff (appellee) after being left at Arkadelphia.   The fact that plaintiff was tired or worried will not alone authorize a verdict for the plaintiff."   The issue of punitive damages was not submitted to the jury.   The appellee, so far as this record discloses, did not ask on the trial for exemplary damages.   Therefore the only questions we have to consider on this appeal are whether or not the issue of appellant's negligence, as above indicated, was properly submitted to the jury, and whether or not the verdict was sustained by the evidence.   When a passenger, unattended, becomes insane upon the train, it is the duty of the railway company to remove such passenger, where the comfort and safety of other passengers on the train require it.   But in performing this duty to the other passengers it must not neglect the duty it owes to the unfortunate insane and helpless one who is also a passenger.

This court in *Price* v. *St. Louis, I. M. & S. Ry. Co.*, 75 Ark. 479, in the case of a passenger who was insane from intoxication, used the following language:  "The railroad company must bestow upon one in such condition any special care and attention, beyond that given to the ordinary passenger, which reasonable prudence and foresight demands for his safety, considering any

manner of conduct or disposition of mind manifested by the passenger and known to the company, or any conduct or disposition that might have been reasonably anticipated from one in his mental and physical condition, which would tend to increase the danger to be apprehended and avoided.   If its servants, knowing the facts, fail to give such care and attention, and injury results as the natural and probable consequence of such failure, the company will be guilty of negligence, and liable in damages for such injury."   This doctrine is apposite here.   While a railway company has the undoubted right to eject an insane passenger, it must be done in a reasonable manner, due regard being had to the time, place and circumstances, so as to provide for the temporary protection and comfort of such passenger.   As is well said by the Supreme Court of Louisiana, "none of the cases hold that the right of exclusion may be exercised arbitrarily and inhumanely, or without due care and provision for the safety and well being of the ejected passenger."   *Conolly* v. *Crescent City R. Co.,* 3 L. R. A. 133, and cases there cited; 1 Fletcher, Car. Pass., p. 263, note; Moore on Carriers, p. 622.   While the instructions were open to some criticism as to verbiage, upon the whole they correctly declared the law upon the issues here presented, and we find no reversible error in any of them.

2.   The court gave the following instruction on the burden of proof:

"The burden of proof is upon the plaintiff in this case to show by a greater weight or preponderance of the evidence that she was put off the train in the manner as alleged in the complaint, and left in condition as therein alleged, and she will not be entitled to recover anything until she has shown these facts by a preponderance, or a material part, of the evidence as they are alleged in the complaint."

This instruction was erroneous.   The words "or a material part" are not synonymous with the word "preponderance."   A "material part of the evidence" might or might not be a preponderance thereof.   The instruction was complete without adding the words "or a material part," and the court erred in inserting these.   But, inasmuch as there was no conflict in the evidence as to the salient facts upon which the liability of the appellant was predicated, the instruction could not have been prejudicial.

3. The appellant among other requests presented the following:

"If you believe from the evidence that plaintiff was put off the train at Arkadelphia and placed in the white waiting room of the depot and remained in said depot until the sheriff came and took charge of her, then the defendant is not liable for anything that occurred after the sheriff got to her."

Appellant contends that this request should have been granted, under the authority of section 4049, Kirby's Digest, which provides that: "Insane persons found at large, and not in the care of some discreet person, shall be arrested by any peace officer, and taken before a magistrate of the county, city or town in which the arrest is made." The statute has no application to cases like this. Appellee, in law, was not an insane person at large. She was the passenger of appellant still, although ejected from its train. She was, at the time the sheriff took charge of her, in appellant's waiting room and in the care of appellant's night operator, to whom she had been intrusted when she was ejected from appellant's train. True, the evidence discloses that this operator went out at the window when appellee went in to the waiting room. Still, under the law, he was in charge of her as appellant's agent. His discretion, it appears, caused him to abandon in haste the poor unfortunate left in his care. But the law required that his discretion should be exercised in the direction of her comfort and safety, and not in leaving her to her fate. His duty was to exercise such care as any reasonably prudent person should, under the circumstances, to protect her against harm and to provide for her comfort. If he was so alarmed that he could not do this himself, it was his duty to call to his assistance others who could. He wholly failed to discharge this duty, and for any injury that resulted to appellee from this cause appellant was liable. The sheriff was not requested by appellant's agent to take charge of appellee, and he did not do so in his official capacity. The custody he took of appellee, as he says himself, was not in his official, but individual, capacity. His kindly offices were interposed in the interest of humanity and by way of assistance rather to appellant, for he kept appellee at the depot, and when he went away left her in charge of appellant's station agent. Doubtless, the kind atten-

tion of the sheriff and others who voluntarily cared for appellee after she was ejected from appellant's train prevented her from receiving greater injuries than she is shown to have sustained. As appellant under the instructions could only be liable for the actual physical injuries appellee received, this generous assistance of volunteers in preventing further injury inured to the benefit of appellant, but did not relieve it of liability for the actual damage done.

4. The argument of counsel was prejudicial. He was not declaring that it was the duty of appellant under the law to provide a physician, but simply stating his opinion as to what, under the evidence adduced, the appellant in the exercise of ordinary care should or could have done. The facts were all before the jury, and it was for them to say what ordinary prudence required. Moreover, the appellant did not ask the court to make the specific ruling that it was not the duty of appellant under the circumstances to have called a physician. We find no error in the ruling as it is here presented.

5. The court, both at the request of appellee and of appellant, confined the jury in its assessment of damages to compensation for the physical pain that appellee may have suffered through appellant's negligence. The allegations of the complaint were sufficient, and there was evidence, to warrant the submission of the question of exemplary damages to the jury. But we can not say as matter of law that appellee was entitled to such damages. Under the evidence it was a jury question; and, since the jury were not allowed to assess any exemplary damages, we are of the opinion that a judgment for $1000 is plainly excessive. The only injuries she received and of which she complained, as discovered by the testimony of her son, were "bruises on her body," "she had a great place," an abrasion, "on her wrist," that was her "greatest complaint." She also complained of her back and hips. She was confined to her bed a couple of days. No permanent injury was shown. Nor is it shown exactly when and where she received the injuries described by her son. In the absence of any consideration for damages by way of punishment, our opinion is that the sum of $100 would be ample compensation for the mere physical injuries which appellee received.

If she will in fifteen days remit, so as to make the judgment $100, it will be affirmed; otherwise reversed and remanded for new trial.