(156 App. Div. 154.)

## MIDDLETON v. WHITRIDGE.

(Supreme Court, Appellate Division, First Department. April 4, 1913.)

1. CARRIERS (§ 318*)—DUTY TO CARE FOR SICK PASSENGERS—EVIDENCE.

In an action against a street railroad for death alleged to have been due to allowing deceased, who was suffering from a stroke of apoplexy, to ride around town on the car for five hours without calling medical assistance, evidence *held* not to warrant a finding that the conductor was negligent in thinking he was drunk and allowing him to remain until he sobered up.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1270, 1307–1314; Dec. Dig. § 318.*]

2. CARRIERS (§ 305*)—PROXIMATE CAUSE—DEATH.

The negligence of a conductor in allowing a person suffering with a cerebral hemorrhage to ride around on a car for five hours *held* not to have been the proximate cause of death; there being no assured treatment that would save his life.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1132, 1136–1139, 1245–1246; Dec. Dig. § 305.*]

Appeal from Trial Term, New York County.

Action by Nellie G. Middleton, as administratrix, against Frederick W. Whitridge, as receiver of the Third Avenue Railroad Company. Judgment for plaintiff, and defendant appeals. Reversed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

James L. Quackenbush, of New York City (J. Ralph Hilton, of New York City, of counsel), for appellant.

R. A. Mansfield Hobbs, of New York City (Frederick N. Van Zandt, of New York City, of counsel), for respondent.

CLARKE, J. Lewis Middleton, plaintiff's intestate, 51 years of age, a forwarding agent and truckman, was in business at 29 Spruce street and lived in an apartment house at the corner of Broadway and 140th street. He was of florid complexion, 5 feet 9¾ inches in height, about 220 pounds in weight, and his general appearance as to health was good. On May 24, 1910, he left his office about 1 o'clock, lunched with a friend on a few sandwiches and a cup of coffee,

and left him about half past 1, saying he was going to the ball game. The telephone operator in the apartment house where he resided saw him going out of the house between half past 2 and 3 o'clock. He spoke to her and seemed in good health. The conductor of a pay as you enter car of the Third Avenue Railroad Company, which ran up Amsterdam avenue, calculating from the time the car left Sixty-Fifth street, said that he reached 140th street about 2:40 or 2:45. He did not see decedent get on the car, but first observed him about 185th street and Amsterdam avenue getting up from his seat on the right-hand side about three seats from the front and change to the left-hand side. At the end of the road at Ft. George the seats have to be turned for the return trip. The conductor tapped him on the shoulder and told him it was the end of the road. He said, "All right! all right!" and started to vomit. The conductor reported to the starter that he had a drunk and could not get him off. The starter told him "to let him sleep it off and carry him down; that he would be all right at the end of the trip." He took him down town from 195th street to the Post Office. He observed him vomiting once in a while and adjusting his spectacles. At the Post Office he asked him for his fare, and he made a search of his pockets, when a gentleman who got on said:

"I have often been in the same boat myself; I have often had a jag on myself; here is the fare. Let him go, and it will be all right."

This conductor did not observe him further on the run up to Sixty-Fifth street, when the car was turned over to a new crew at 5:35 p. m. The new conductor's attention was first called to Mr. Middleton by a passenger, who, on getting off at Twenty-Second street, said a man in the car had vomited. He went up to him and observed vomit on his clothing and on the floor. At 175th street Mr. Middleton had dropped his pocketbook on the floor. A passenger picked it up and gave it to him, and he put it in his pocket. He was then sitting in a slouching position with his hands stretched out. At Ft. George the conductor sprinkled sand on the floor and told the starter then on duty that he had a man in the car who appeared to be drunk. The starter got on the car, looked at the man, and told the conductor to let the man ride down, the air might revive him, or let him sleep it off, the air would do him good. On the way down, at 125th street and Third avenue, the conductor told an inspector that he thought the man was drunk and helpless. The inspector called a policeman and ordered the car to the barn at 129th street. There the employés of the company carried him out of the car and laid him on the sidewalk. The police officer considered the man was intoxicated. "That was my judgment," he testified. He rang for the patrol wagon from the police station, and he was taken to the station at 7:45. The officer reported that he had a drunk, but the lieutenant at the desk made a personal examination, and applied the tests taught by long experience, and, coming to the conclusion that he was sick, sent for an ambulance, and he was taken to the Harlem Hospital. There the trouble was diagnosed as cerebral hemorrhage. The next day he was moved

about two miles to the Red Cross Hospital, where he died that night at 11:45.

This action is to recover of the defendant damages for said death. It is conceded that the defendant is in no way responsible for the cerebral hemorrhage or stroke of apoplexy. There was no collision, no accident, no assault. It happened while Mr. Middleton was on the car, not because he was there, or on account of anything which occurred while there. The actionable negligence claimed, upon which alone this judgment rests, is the failure of the conductors, motormen, and starters of this street railroad company to properly diagnose Mr. Middleton's condition and promptly procure for him medical treatment and complete rest. The claim is that this neglect aggravated the condition, which it is conceded these employés neither caused nor were responsible for, and accelerated the death, which might not otherwise have happened. This leads to two inquiries. First. Was there actionable negligence? Second. Was such alleged negligence the proximate cause of death?

[1] First. While it is shocking to think that a man stricken with apoplexy should be carried around the city for five hours in an open street car, the question is: Does it follow that the defendant is responsible in money damages? It is established that, so far as external appearances are concerned, it is difficult to differentiate between intoxication and apoplexy. Even medical men and hospital officials make mistakes. In answer to the question:

"Is it not difficult often to diagnose alcoholism and apoplexy?"

Dr. Mosher answered:

"It is difficult sometimes. Q. And isn't it a fact that the mistake is frequently made by hospital doctors or ambulance surgeons? A. * * * It is a mistake that is made. Q. And by physicians? A. Yes."

And Dr. Touart testified:

"Sometimes a mistake in diagnosis is made by physicians in diagnosing the difference between drunkenness and a stroke of apoplexy. * * * Sometimes physicians diagnose apoplexy as drunkenness." "Q. Now, if at 3 o'clock in the afternoon you had a glance, a look, at a man who was not unconscious, who was vomiting, whose color was normal, florid, not pale, who, when spoken to, said, 'All right! all right!' those facts would not indicate to even a physician that that man was suffering from a stroke of apoplexy, would they? A. No, they would not." "I agree with that statement of Church Peterson, in diagnosing apoplexy, when he says: 'Every case must be carefully analyzed, and often then only a presumptive diagnosis can be finally reached. The diagnosis of a case of apoplexy is sometimes an extremely difficult one for physicians.' If a physician observed a man on a car at the end of the route, and he asked him for his fare, the man had been vomiting, and when asked for his fare he put his hand down in his pocket, that would not indicate a condition of unconsciousness. If a physician observed that, that would not indicate a condition of an apoplectic stroke."

Was it negligence, then, for the two motormen, two conductors, two starters, and an inspector to conclude that the man was under the influence of liquor, and not to discover that he had a stroke of apoplexy? It must be taken into consideration, also, that a policeman and two passengers came to the same conclusion, and that no passenger during

all those five hours made any suggestion to the employés that the man was sick, rather than as he appeared. The treatment by these employés of this unfortunate passenger, instead of being susceptible to the charge of gross brutality and inhumanity, seems to have been actuated by a kindly and sympathetic feeling. Instead of being thrown off the car, he was allowed to remain where he had put himself, with the notion that it was the best thing for him; that he would sleep it off, and that he had better be in the open air.

The respondent cites a number of cases, with excerpts from opinions. None of them present a similar state of facts to that at bar. In Sheridan v. Brooklyn & Newton R. R. Co., 36 N. Y. 39, 93 Am. Dec. 490, the conductor had compelled a boy to get up and give his seat to another passenger, and to stand out on the crowded front platform, from which he was thrown. In Wells v. New York Central & H. R. R. R. Co., 25 App. Div. 365, 49 N. Y. Supp. 510, the gateman at defendant's station knew the passenger, knew the train he wished to go on, and had promised to notify him when it arrived, knew that he had been taken suddenly ill and was unable to care for himself, and, having forgotten to notify him of the arrival of the train, directed a policeman to eject him from the station, and he, while wandering among the tracks, was run over by another train. In Regner v. Glens Falls & St. F. S. R. Co., 74 Hun, 202, 26 N. Y. Supp. 625, the conductor forcibly ejected an assumed intoxicated person from the car who was really suffering from St. Vitus' dance. Dwinnelle v. New York Central & H. R. R. R. Co., 120 N. Y. 117, 24 N. E. 319, 8 L. R. A. 224, 17 Am. St. Rep. 611, was the case of an assault upon a passenger by a Pullman car porter who knocked him insensible. Gillespie v. Brooklyn Heights R. R., 178 N. Y. 349, 70 N. E. 857, 66 L. R. A. 618, 102 Am. St. Rep. 503, was the case of gross abuse by a conductor in calling a woman passenger a deadbeat and otherwise reviling her when she asked for her change. McLeod v. N. Y., C. & L. R. R. Co., 72 App. Div. 120, 76 N. Y. Supp. 347, was the case of an unlawful arrest and detention by a railroad detective. Conolly v. Crescent City R. R. Co., 41 La. Ann. 57, 5 South. 259, 6 South. 526, 3 L. R. A. 133, 17 Am. St. Rep. 389, was where a sick passenger had been ejected from a car and left lying in the gutter on an inclement day for four hours. So, Paddock v. Atch., T. & S. F. R. Co. (C. C.) 37 Fed. 841, 4 L. R. A. 231, and Railway Co. v. Parry, 67 Kan. 515, 73 Pac. 105, and St. L., I. M. & S. Ry. Co. v. Woodruff, 89 Ark. 9, 115 S. W. 953, and Eidson v. Southern Ry. Co. (Miss.) 23 South. 369, and Gill v. Rochester R. R. Co., 37 Hun, 107, are all cases where the defendant had put passengers off of trains without seeing to it that they were properly cared for. There was a positive act on the part of the employé, and the passenger received injury from the position in which he had been put; that is, a negligent act for which the carrier was held responsible. But no case holds a street railroad employé to the duty of correct medical diagnosis, and, when nothing is done to interfere with the passenger, holds the company responsible for an omission to call a doctor or transport him to a hospital. We think that actionable negligence was not made out.

[2] Second. Respondent claims that, while the defendant was not responsible for the original stroke, that was slight, and if the patient had been promptly put to bed, and received medical treatment, his life might have been prolonged. There was no autopsy, so the location and extent of the rupture is not known. In answer to hypothetical questions, the physicians expressed their opinion that the original rupture was slight. But the questions omitted the facts as to his previous physical condition. He had arteriosclerosis, a systolic murmur in the aortic area, albumen, and granular casts. Dr. Mosher testified:

"I discovered that he had arteriosclerosis and that his arteries were thickened. That might have developed some years previous. That is a predisposing cause to a stroke of apoplexy. * * * The combination of albumen and the granular casts would indicate a diseased kidney. Mr. Middleton, I believe, had granular casts and albumen in the kidneys. Mr. Middleton had thickened arteries, stiff arteries."

He also testified:

"Q. You cannot say with reasonable certainty, can you, Doctor, that from the initial stroke of apoplexy sustained by Mr. Middleton he would have recovered, can you? A. No. * * * Q. So far as you know, the initial stroke of apoplexy may have caused his death? A. It may. * * * Q. You cannot say with reasonable certainty that the proximate cause of his death was not the initial stroke of apoplexy, can you? A. I cannot say. Q. You won't say it was not, would you? A. No."

Dr. Touart testified:

"He did have an arteriosclerosis of the blood vessels. Ordinarily it takes some years for that condition to develop, and get in the condition that it was in this instance in Mr. Middleton's body. I should say he probably had arteriosclerosis of the blood vessels extending over some years."

Dr. Neff testified that the stage was prepared in the case of Mr. Middleton for a stroke of apoplexy.

"Such a break, when the stage is prepared, may occur while the patient is lying at rest in bed. It might occur while he was lying at rest in a hospital surrounded by skilled medical men. * * * In certain forms of hemorrhage, there is no assured treatment that will save his life. Q. In a hemorrhage, where it occurs slight at first, and you give him the treatment of rest, there is no assured treatment that will save his life, is there, under the best medical attention? A. Only probable. It is not assured. * * * Q. But when the stage is prepared, and you know it, the conditions such as you have stated, the hemorrhage comes, there is no medical skill that can surely save him, is there? A. No; not surely. * * * From a rupture in this artery, when I claim it occurred, with it in a diseased condition, at home, lying in bed, if he was moved to the hospital instantly, I cannot state as a fact that skilled medical men could save him. I could not surely save him. Q. Well, then, if he was on a car, and moved instantly to the hospital, with a rupture, you could not assure the family absolutely that you could save him, could you? A. No."

All of the evidence was given by witnesses for the plaintiff. Upon the hypothetical question propounded by plaintiff, the doctors ventured the opinion that the original lesion was slight, and they gave the guess that, if he had been promptly attended to, his life might have been saved, or prolonged for a time. But just when the employés ought to have discovered his condition, and just when he should have been removed to a hospital, and how long it would have taken, and

how much jolting he would have received in that transfer, is to the last degree speculative and uncertain. The next day he was moved from one hospital to another, a distance of two miles. Who can say what effect that transfer had?

Respondent puts much reliance upon the McCahill Case, 135 App. Div. 325, 120 N. Y. Supp. 1. But in that case there was an original tort. The victim had been run down, and his thigh broken, and the defendant was responsible for the accident, and hence for its results. This court said:

. "Upon all the evidence, I think it was a question for the jury whether the injury caused by the negligence of the defendant did not produce the delirium tremens, which, in the opinion of the doctors, was the immediate cause of death. If the decedent, but for the injury, might have lived for many years, and the injury, plus his condition, when he received it, caused the delirium tremens, of which he died, I think the case comes within the. meaning of section 1902 of the Code of Civil Procedure, which gives a cause of action to recover damages for a wrongful act, neglect, or default by which the decedent's death was caused."

And in the Court of Appeals, 201 N. Y. 221, 94 N. E. 616, Ann. Cas. 1912A, 961, Judge Hiscock, in answering the question whether the appellant's negligence was, legally speaking, the proximate cause of the intestate's death, said:

"In determining this question, it will be unnecessary to quote definitions of proximate cause which might be useful in testing in obscure, involved, or apparently distant relationships between an act and its alleged results, for the relationship here is perfectly simple and obvious. The appellant's automobile struck and injured the traveler. The injuries precipitated, hastened, and developed delirium tremens. These caused death. There can be no doubt that the negligent act directly set in motion the sequence of events which caused death at the time it occurred. * * * The principle has become familiar in many cases that a negligent person is responsible for the direct effects of his acts, even if more serious in cases of the sick and infirm, as well as in those of healthy and robust people; and its application to the present case is not made less certain · because the facts are somewhat unusual and the intestate's prior disorder of a discreditable character. * * * "

It does not seem that the responsibility for this death has been traced to the defendant with that degree of certainty which the law requires. It was not responsible for the cerebral hemorrhage. It is really but guesswork to say that prompt attention would have saved the life. Defendant's liability as the proximate cause of death is not satisfactorily established. Therefore, on both grounds, plaintiff failed to make out a cause of action.

The judgment and order appealed from should be reversed, and the complaint dismissed, with costs. All concur.