WEIRLING v. ST. LOUIS, IRON MOUNTAIN & SOUTHERN
RAILWAY COMPANY.

Opinion delivered December 7, 1914.

1. CARRIERS—DUTY TO PASSENGERS—PERSONS UNDER DISABILITY—INSANE PERSON.—A carrier of passengers must bestow upon an insane passenger, when it has knowledge of the passenger's condition, any special care and attention beyond that given to ordinary passengers, which reasonable prudence and foresight demands for such passenger's safety.

2. CARRIERS—INSANE PASSENGER—DUTY OF CARE.—Plaintiff's decedent while a passenger on defendant railway company's train, became insane and attempted to throw her baby out of the window. She was prevented by the porter, who then went to inform the conductor. In his absence plaintiff's decedent threw herself and baby out of the window and both were killed. Held, if the employees of the railway company failed to exercise the care that a reasonably prudent person would have exercised under the circumstances to prevent the injury and death of the passenger, then the carrier would be guilty of negligence, otherwise it would not be.

Appeal from Marion Circuit Court.; George W. Reed, Judge; affirmed.

STATEMENT BY THE COURT.

On the 13th day of August, 1910, Mrs. B. H. Weirling was a passenger on appellee's train.   She boarded the train at Aurora, Mo., and her destination was Yellville, Ark.   Two or three years prior to that time she was physically broken down, but at the time she started on her journey she was apparently in good health.   She was

accompanied by her two children, Gertrude, who was six years of age, and Virginia, who was nearly three years old. She was sitting with her children on the right side of one of the day coaches, four or five seats from the end next to the sleeper. She was observed by passengers on the train to be very nervous. Her smallest child was lying on the seat in front of her, apparently in a comatose condition. Mrs. Weirling changed seats frequently. "She would sit in the front end of the coach a while and then move back, carrying the child in one arm and her suitcase in the other." The train passed through two or three tunnels and the gas was very disturbing in passing through them and seemed to distress Mrs. Weirling. A commotion was heard in the car and passengers, on looking around, saw the little child in the seat crying and Mrs. Weirling standing up, partly between the seats, striking at the negro porter on the train, who was holding his hands in front of his face, warding off her blows. Passengers gathered around them. Mrs. Weirling was talking excitedly, but the porter said nothing. The porter went to the rear of the coach. It was ascertained that Mrs. Weirling had endeavored to throw her baby out at the window and the porter had prevented her from doing so. A brakeman, who was a white man, came upon the scene during the trouble. Mrs. Weirling, who had resumed her seat in the meantime, when the brakeman arrived, arose and said to him, "You will be my friend?" The brakeman assured her that he would, and she then sat down again. An old gentleman, a passenger on the train, sat down by Mrs. Weirling and talked to her. The passengers closed the windows on the side of the coach where Mrs. Weirling was seated. Things quieted down, and the passengers were of the impression that everything was all right. About that time, and after the brakeman had gone toward the front of the car, a passenger observed that Mrs. Weirling had her baby apparently out of the window on the opposite side from where she had been sitting, with one hand on the sill and her knees on the seat. Passengers grabbed at her clothing but it

tore loose and she plunged down over a trestle, still holding her child in her arms. She struck the trestle as she fell and the child fell from her arms, both falling to the ground. Mrs. Weirling. died almost instantly and the little child lived several hours.

After the train had passed through the tunnel Mrs. Weirling was heard to remark that she would never come over that road again on account of the gases being disagreeable. During the commotion occasioned by her attempt to throw her child out of the window, a lady passenger, one Mrs. Griffith, began talking to Mrs. Weirling, and an old gentleman sat down by her and she quieted down, and it was thought that there was no further danger. After she had quieted down the porter went away to get the conductor. At the time he left Mrs. Griffith and the old gentleman were with her. The witness stated that he thought that she had quieted down and that he thought that all danger was over. If he had not thought so he would have stayed right with her himself.

One witness said that he had been in the car where Mrs. Weirling was something like three or four minutes, and that there were people standing up in the aisle and seated in front of the seats where Mrs. Weirling was located. He saw Mrs. Weirling jump out of the window and saw a gentleman grab her as she went out.

Other witnesses stated that when Mrs. Weirling attempted to throw her child out of the window they saw the colored porter catch the child and pull it back. It was then that Mrs. Weirling jumped up screaming and began hitting the porter in the face. The porter pulled the child back and laid it down on the seat. After this commotion, witnesses agree that the spell had seemed to pass off and that she stepped back in between the seats and took the child and seemed to be perfectly quiet. One passenger who was observing her says that "she would close her eyes tight and then open them, but remained perfectly quiet." That he "saw her raise up deliberately with her child in her arms and start across the car." He thought she had gotten up to warm. She

walked deliberately between the seats and all at once put her head down and jumped through the window with her baby. He saw what she was going to do and grabbed at her foot as she went out of the window but failed to catch it. Another person grabbed her clothing but it was not strong enough and gave way.

All agreed that after Mrs. Weirling had first attempted to throw her baby out at the window she quieted down, and several passengers stated that they thought that all danger had passed. Mrs. Griffith testified that Mrs. Weirling sat on the seat behind her for a while. At the time of the accident she had two seats turned together, just in front of witness. Mrs. Weirling spoke to some gentleman and asked about tunnels and asked if any one ever got killed going through them and he told her no. After that they passed through another tunnel and witness's attention was called to Mrs. Weirling by the little girl saying, ''Mamma, don't throw the baby out of the window,'' and just about that time the porter grabbed the baby and pulled it back in, and she began striking at the porter, but the porter acted very gentlemanly toward her and did nothing except to keep her from destroying the child. While she was striking the porter witness went to where they were and began talking to Mrs. Weirling. Witness told the porter to get the conductor, and the porter at once started for him. Witness offered to sit down with the lady and ride through the tunnel with her and help her with her baby, but she refused to allow witness to do so, and, as she quieted down, witness returned to her seat. When witness returned to her seat, after the porter had left, Mrs. Weirling was perfectly quiet, and as witness was sitting down in her seat Mrs. Weirling must have been going across the aisle. She saw her then go out at the window. At the time witness left Mrs. Weirling witness did not think that there was any danger of any further trouble.

The porter testified that while passing through the coach in which Mrs. Weirling was sitting all at once she

took her baby and threw it out of the window. He caught
it by the leg and pulled it back. Then she struck him.
He let the window down, and told her not to throw her
baby out at the window. At that time she sat down and
a lady across the aisle and an old gentleman from the
other end of the car came up and the lady asked Mrs.
Weirling for her baby and she refused to let her have the
child, saying she could attend to her own children. A
lady passenger and an old gentleman said, "Get the con-
ductor." About the time they said this the brakeman
walked up. Then Mrs. Weirling had sat down and was
perfectly quiet. The lady passenger said to the witness,
"Go and get the conductor; we will see after her." When
witness got on the car platform he met the brakeman and
the conductor on their way back to the car where Mrs.
Weirling was. When the witness started away to get the
conductor Mrs. Weirling was sitting down perfectly quiet
and had her eyes closed.

The conductor testified that the brakeman came after
him, and both the porter and the brakeman told him about
the peculiar conduct of Mrs. Weirling. The brakeman
stated to him that a lady was acting very strangely in the
day coach. He immediately went back to see about her.
He saw the porter as he was going back to see what the
matter was. By the time he got back to the coach where
Mrs. Weirling was she had jumped out of the window.
He immediately stopped the train and went back for Mrs.
Weirling and the child. He stated that the brakeman and
the porter were under his control. If anything went
wrong it was their duty to notify the conductor. He was
asked if it was the duty of both the brakeman and the
porter to leave a crazy person trying to get out of the win-
dow to go and hunt up the conductor, and answered,
They would hardly have occasion for that." He said it
was their duty to come at once and notify him when any-
body got into trouble. He was asked, "Is it their duty
for both to go and hunt you and tell you about it, to both
come at once, is that right?" and answered, "No." He
stated that it was their duty to notify him; it didn't re-

quire both of them to come; all that was required was notice to him, and a passenger could come and tell him.

After a question was propounded, in which the condition of Mrs. Weirling was recited, the conductor was asked the following question: "I will ask you whether or not there any regulations of the railroad company or under any law, where the woman was in peril of the kind mentioned, if the brakeman and porter should walk off after she had tried to throw her baby out of the window, and leave the lady if that occurred, if you know?" and answered as follows: "Yes; in case of emergency in which they pulled that cord." He was further asked: "You stated a little while ago that there was no rule made for the porter and brakeman as to what to do at all times. No rule at all?" and answered, "No."

Q. When troubles come up, of this kind, they are to exercise their own judgment, are they?

A. Their own judgment in cases like that. Their own views fix it.

Upon the above facts, the appellant, as administrator of the estate of his wife, Edna Weirling, for the benefit of the estate and also for the benefit of himself, the next of kin, brought suit against the appellee, alleging that Mrs. Weirling became insane while she was a passenger on appellee's train, and that after this fact became known to the employees and agents of appellee in charge of the train they failed and neglected to use ordinary care and prudence for her protection, but let her jump from a window, by reason of which she was mortally injured.

The appellee answered, denying the allegations of negligence.

After the above facts were developed by the evidence the court instructed the jury, at the instance of the appellant, as follows:

"1. I instruct you, gentlemen of the jury, if you find from a preponderance of the evidence in this case that Edna Weirling, deceased, was a passenger on defendant's train at the time and place mentioned in the complaint,

and that while she was such passenger lost her mind and became deranged to such an extent as to render her incapable of caring for and protecting herself, and that the employees of the railway company knew of her condition, then I instruct you that it became their duty to bestow upon her any special care and attention beyond that given to the ordinary passenger which reasonable prudence and foresight demands for her safety considering any manner of conduct or disposition of mind manifested by her, or conduct or disposition that might reasonably be anticipated from one in her mental and physical condition which would tend to increase the danger to be apprehended and avoided. And if the agents and employees of the defendant, after discovering the condition of her mind, failed to use such care, when they could have reasonably done so, and by so doing **they could have prevented** the deceased from jumping from the car window, and you further find that by jumping from the car window she sustained injuries from which she died, your verdict should be for plaintiff.''

The court refused to give appellant's prayer for instruction No. 3, which is as follows: ''Although you may find from the evidence in this case that Mrs. Edna Weirling was surrounded by passengers of mature age, discretion and prudence, and that they knew the condition of Mrs. Edna Weirling as well as the porter and brakeman, and that she was left in the care and presence of said passengers by the porter and brakeman while they went for the conductor, still there would be no legal duty on the part of said passengers to protect her from harm, and the defendant could not relieve itself of liability in this case by its said employees leaving her in the presence and care of said passengers, provided that you find that the act and conduct of the porter and brakeman at the time and under the circumstances was a failure on their part to use the care and prudence due to a passenger in the condition and situation of the deceased, as explained in instruction 1.''

The court, at the request of the appellee, granted its prayer No. 4, which, in effect, told the jury that, even though the porter and brakeman may have thought or may have had reason to believe that Mrs. Weirling was insane, they should find for the appellee if they believed from the circumstances that the porter and brakeman thought the safest plan was to notify the conductor, and if under the circumstances they acted as reasonable and prudent persons in so doing, and that during their absence, while so doing, Mrs. Weirling was killed, they should find for the appellee.

In prayer No. 5 the court told the jury that if, under the circumstances, it was reasonable for the porter and brakeman to leave Mrs. Weirling in the care of the passengers while they went for the conductor, that their doing so was not an act of negligence.

In appellee's prayer No. 5½ the court told the jury that they should take into consideration the circumstances by which the porter and brakeman were surrounded, as they appeared to them acting as reasonable and prudent men at the time and the impression such circumstances were likely to produce and did produce on said employees, and if, guided by such impressions, they, with due diligence, bestowed upon the deceased such attention as they, in good faith, believed her condition demanded, their verdict should be for the defendant.

And in appellee's prayer No. 11, the court told the jury that before they could find for the plaintiff they must believe from a preponderance of all the evidence in the case that the employees, knowing the mental condition of Mrs. Weirling, failed to exercise such care and prudence as reasonably prudent persons occupying their positions would have used under the circumstances.

The verdict and judgment were in favor of the appellee, and this appeal has been duly prosecuted.

*Hamlin & Seawell, Jones & Seawell* and *Sam Williams,* for appellant.

1. The duty of a common carrier to persons known to be laboring under disability, physical or mental, is

stated in 75 Ark. 479-491. If its servants, knowing the facts, fail to give the special care and attention, beyond that given ordinary passengers, which reasonable prudence and foresight demand for the passenger's safety, the carrier is liable. 89 Ark. 91, 15, 16; 45 S. W. 1028; 96 *Id.* 102; 137 *Id.* 437. Viewed from the standpoint of these authorities, the court erred in its charge. The instructions are conflicting, and hence error. 104 Ark. 67; 93 *Id.* 140; 95 *Id.* 506; 101 *Id.* 37.

2. Instructions that certain state of facts would not be negligence invade the province of the jury. 58 Ark. 109; 51 *Id.* 88. Nor should instructions single out and stress single facts. 89 Ark. 522; 89 *Id.* 522; 109 S. W. 950.

3. The officers had no right to presume passengers would perform their duty. 59 Ark. 185-196. It was negligence for both the porter and brakeman to leave her. 75 Ark. 491; 89 *Id.* 522; 108 *Id.* 490.

*E. B. Kinsworthy, McCaleb & Reeder* and *T. D. Crawford,* for appellee.

1. Accidents which can not be foreseen can not be the basis of liability. *Railway Co.* v. *Copeland,* ms. op.

2. There is no error in the court's charge, and the testimony shows that the employees, after discovering the passenger's condition, gave the special care and attention due. 75 Ark. 479-491.

WOOD, J., (after stating the facts). In *Price* v. *St. Louis, I. M. & S. Ry. Co.,* 75 Ark. 479-491, we announced the duty which carriers owe to their passengers who are laboring under disability as follows:

(1) "The railway company must bestow upon one in such condition any special care and attention beyond that given to the ordinary passenger which reasonable prudence and foresight demands for his safety, considering any manner of conduct or disposition of mind manifested by the passenger and known to the company, or any conduct or disposition that might have been reasonably anticipated from one in his mental and physical condition, which would tend to increase the danger to be ap-

prehended and avoided. If its servants, knowing the facts, fail to give such care and attention, and injury results as the natural and probable consequence of such failure, the company will be guilty of negligence, and liable in damages for such injury. It is bound to exercise all the care that a reasonably prudent man would to protect one in such insensible and helpless condition from the dangers incident to his surroundings and mode of travel." See, also, *St. Louis, I. M. & S. Rd. Co.* v. *Woodruff*, 89 Ark. 9, 15, 16.

In Thompson on Carriers of Passengers, section 5, pages 270-271, it is stated: "It is consistent not only with common humanity, but with the legal obligations of the carrier, that if a passenger is known to be in any manner affected by a disability, physically or mentally, whereby the hazards of travel are increased, a degree of attention should be bestowed to his safety beyond that of an ordinary passenger, in proportion to the liability to injury from the want of it. But in order that the carrier may be invested with this duty, it is necessary that the condition and wants of the passenger in this respect should be made known to him or his servants." *Cincinnati, Ind., St. L. & C. Ry. Co.* v. *Cooper*, 6 L. R. A. 241. See also *Robt. Croom* v. *Chicago, Mil. & St. P. Ry. Co.*, 52 Minn. 296; 4 Elliott on Railroads, § 1577, p. 371; 6 Cyc. 598, and note; *Adams* v. *St. Louis S. W. Ry. Co. of Texas*, 137 S. W. (Tex.) 437.

(2)    The instructions of the court, considered as a whole, correctly declared the law. It is unnecessary to comment upon each one of the instructions. The measure of appellee's duty to Mrs. Weirling was defined in conformity with the law as announced by this court in the cases mentioned in the first instruction given at the instance of the appellant. The court submitted the issue as to whether or not appellee was guilty of negligence in instructions which, when construed together, in effect told the jury that if the employees of appellee failed to exercise the care that reasonably prudent persons would have exercised under the circumstances to prevent the injury

and death of Mrs. Weirling, that appellant would be guilty of negligence, otherwise it would not be.

The instructions are not open to the criticism which appellant's counsel make of them, and they fairly submitted the issue of negligence to the jury.

There was evidence to sustain the verdict. The judgment is therefore correct and it is affirmed.